_____ FILED_____ ENTERED
_____LOGGED_____ RECEIVED

APR 0 3 2017

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____DEPUTY

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH KEVIN@GCRINVEST.COM THAT ARE STORED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION

)
)
)
)
)

Case No. 18 - 7 0 5 - ADC

UNDER SEAL

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Loi H. Cao, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

I make this affidavit in support of an application for a search warrant for electronic communications and other information associated with the user account KEVIN@GCRINVEST.COM, which is currently stored at premises controlled by MICROSOFT CORPORATION.

1.     MICROSOFT CORPORATION ("MICROSOFT") is an email provider headquartered at 1 Microsoft Way, Redmond, Washington, WA 98052. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require MICROSOFT to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized personnel will review that information to locate the items described in Section II of Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed with the FBI since October 2008. From November 2014 until the present, I have been assigned to investigate violations of federal law involving a range of white-collar criminal violations.  I have completed several computer internet fraud in-service training courses. During

these courses, I received training concerning the use of computers, IP addresses, and email servers, among other things. I am also a Certified Public Accountant and have been trained in the use of numerous financial computer systems and databases. Over the course of several investigations, I have consulted with other cyber professionals in the law enforcement field regarding the evidentiary value of computers, storage devices, email and cell phones in conjunction with financial and criminal investigations.

3.      Through my training and experience, I have become familiar with the methods and techniques used by criminals to commit economic crimes, such as wire fraud, bank fraud, and how those criminals conceal and store information derived from such criminal activity.

4.      This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud) have been committed by **KEVIN MERRILL ("MERRILL")**. There is also probable cause to search the electronic communications and other information described in Attachment A with regard to the user account associated with the email address **KEVIN@GCRINVEST.COM ("Target Email")** for evidence of this crime further described in Attachment B.

## JURISDICTION

6.      This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction," as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

2

## STATEMENT OF PROBABLE CAUSE

### Overview

7.      The ongoing federal investigation has uncovered probable cause that beginning in approximately 2012, MERRILL initiated a scheme to defraud investors by promising to use their funds to purchase portfolios of consumer debt--charged off credit card or utility accounts-- collect on the debt, or sell the portfolios, pay the investors a significant profit, and return their principal. MERRILL, through his company, Global Credit Recovery, promised double digit returns to investors from their investment in these consumer debt purchases.

8.      Your affiant's investigation has revealed that MERRILL failed to invest millions of dollars of investor funds as MERRILL had promised, that MERRILL used investor funds to re-pay other investors their principal or their purported returns, and that MERRILL diverted significant amounts of investor monies for personal gain. MERRILL's personal expenses include several real estate purchases, high-end vehicle purchases, personal travel, jewelry, personal credit card expenses, and gambling expenses. Based on your affiant's training and experience, this pattern of conduct is indicative of a Ponzi scheme.  The scheme to defraud is ongoing.

9.      Your affiant is aware of two companies which MERRILL has used and is using to further his fraudulent investment scheme, DELMARVA CAPITAL SERVICES, LLC ("DELMARVA") and GLOBAL CREDIT RECOVERY ("GCR"). Your affiant is also aware of two types of contracts which MERRILL has used to defraud his investors. The contracts MERRILL used were an "Investor Agreement" and a "Promissory Note".

### DELMARVA

10.      Your affiant's investigation has revealed that DELMARVA was registered in the state of Maryland and MERRILL is the sole managing member. MERRILL incorporated K.B.

MERRILL ASSOCIATES, LLC in August 1999. In January 2009, MERRILL changed the name of K.B. MERRILL ASSOCIATES, LLC to DELMARVA. In August 2012, DELMARVA, was dissolved and is no longer in good standing with the state of Maryland. Although the company was dissolved in 2012, MERRILL continues to use the company name, and maintains bank accounts in the name of DELMARVA at FDIC insured institutions which MERRILL uses to facilitate his fraudulent investment scheme.

<i>Interview</i>

11.     On October 26, 2017, MERRILL consented to an interview at the Federal Bureau of Investigation ("FBI") Baltimore Field Office. MERRILL had been contacted by an investor the FBI previously spoke with concerning MERRILL's scheme and the investor wanted to know why the FBI was investigating MERRILL. MERRILL then contacted the FBI in an attempt to explain his business. After his arrival, MERRILL was advised by FBI agents prior to questioning that the interview was voluntary and he was free to leave at any time. MERRILL was also offered a break and water, which he declined.

12.     MERRILL stated the current name of his company was Global Credit Recovery, LLC ("GCR"), but the initial name of his company, formed in 1999, was K.B. Merrill and Associates. MERRILL stated he is the sole owner of GCR. Initially, MERRILL serviced debt portfolios owned by others, specifically a hedge fund in California he did not name, and the company grew from two employees to 127. After the hedge fund began servicing their own portfolios, MERRILL claimed his company was funded with money from a company owned by Steve Biscotti, owner of the National Football League franchise Baltimore Ravens. This relationship lasted for several years, until the Biscotti group stopped investing, and MERRILL had to start over.

4

13.     MERRILL stated 85% to 95% of what he buys is credit card debt from Chase Bank, Citibank, Wells Fargo, and other credit card originators. These purchases are of credit card debt balances of $5,000 and below, referring to that as the "sweet spot" for GCR to make money. The purchase of this debt is done through a network of brokers and buying directly from banks. The decision to buy a specific portfolio is based on "a lot of proprietary modeling," and MERRILL stated he uses all three credit reporting bureaus in his assessment.

14.     MERRILL stated that when he first started, he collected on the debt, and then remitted to the investors via a trust account. Currently, MERRILL stated he uses separate bank accounts/separate trust accounts per lending institution. MERRILL explained money comes in from the debt servicer and goes directly to the investor. MERRILL stated he does not touch the money and that is what he prefers.

15.     MERRILL stated he is currently trying to get rid of individual investors because of the administrative burden, and he is accomplishing the reduction of individual investors by paying down the principal on the investment and remitting interest every quarter. In his interview, MERRILL stated the lowest amount he would accept from a new investor is $250,000; however, in your affiant's review of accounts involved in this investigation, MERRILL continues to accept funds from individual investors well below the $250,000 minimum.

16.     MERRILL also stated he has three or four "family offices," i.e., a group of investors who have their money managed by a financial advisor who brings the GCR investment opportunity to the investors. Each "office" has their own special purpose vehicle "SPV" to manage the purchase and sale of the debt portfolios. MERRILL currently outsources debt collections to DeVille Asset Management ("DEVILLE"), and the money from the debt collected by DEVILLE goes directly into the SPV. Regarding the "Family Office" accounts, MERRILL reiterated he does

not touch the money. However, MERRILL did not name any of these SPVs, nor did he provide any verification information for the investors. When asked if he had ever lost money for his investors, MERRILL stated, "No way."

17.     During the interview MERRILL referred to a blank "Investment Agreement" he had brought with him to the interview. MERRILL pointed out in the "Investor Agreement" "*Investor shall be entitled to one hundred percent (100%) of the net profits in your given portfolio up to 13% annual. GCR will share in profits after the 13% hurdle is reached.*" MERRILL explained GCR makes its money after they have met the 13% or stated percent of net profit for the investor. MERRILL stated he loses money until he reaches the investor agreement net profit percentage. MERRILL reiterated that he has never lost money on any of the portfolios he has purchased.

18.     At the conclusion of the interview, MERRILL provided the "Investment Agreement" to investigators. Based on your affiant's review of the "Investment Agreement," item number one of the "Investor Agreement" states "*Global shall partake in the business of buying, selling, and recovering consumer debt portfolios and shall identify and purchase such portfolios and shall identify and purchase portfolios for Investor commensurate with the monetary investment made by Investor. Such portfolios shall be titled in the name of Investor and shall be managed at the sole discretion of Global and its management.*" This paragraph is identical to item one found in the signed "Investor Agreements" for investors 1 and 2 who are discussed later in the affidavit. At the end of the interview, MERRILL agreed to send investigators a list of his investors and a list of the companies from which he purchases debt. As of the date of this affidavit, no such production from MERRILL has been received.

GLOBAL CREDIT RECOVERY

19.     Your affiant's investigation revealed that Global Credit Recovery, LLC ("GCR") was created under Maryland law in December 2011. In February 2013, GCR's articles of organization were amended to list MERRILL as the sole managing member. A review of documents filed with the Maryland State Department of Assessments and Taxation for GCR list only MERRILL and the Resident Agent as persons associated with that company. During your affiant's October 26, 2017 interview of MERRILL, MERRILL identified himself as the sole owner of GCR, and the blank "Investor Agreement" provided by MERRILL listed www.gcrinvest.com as the website for Global Credit Recovery, LLC.

20.     Subscriber information obtained from GoDaddy.com indicated MERRILL created the domain gcrinvest.com on September 1, 2014 with an expiration date of September 1, 2019. According to GCR's website *"Global Credit Recovery specializes in the acquisition of defaulted or charged-off accounts receivable portfolios from consumer credit originators. Charged-off receivables are the unpaid obligations of individuals to credit originators, such as credit card issuers, consumer finance companies, retail merchants, telecommunications and other utility providers."* GCR's website further states, *"Since these receivables are delinquent or past due, Global Credit Recovery is able to purchase them at a substantial discount. Global Credit Recovery does not perform collection process for these receivables in-house. Once acquired, the collection of these receivables is outsourced to a network of legal entities with strong expertise in consumer debt or resold."* Through its website, GCR claims to have double digit rates of returns for its investors stating, *"Global Credit Recovery has produced outstanding financial returns for its investors over the last 6 years (20+% Annually) buying and reselling consumer credit card portfolios. Buying these portfolios at a fraction of their face value for cents on the dollar allows*

7

*for unique resale and legal based collection opportunities.*" In the opportunity section of www.gcrinvest.com, the **Target Email** is listed as a contact for more investment information. According to records obtained from GoDaddy.com, on September 3, 2014, MERRILL requested GoDaddy.com to create the **Target Email**.

Scheme

21.     MERRILL, through the use of "Investor Agreements" and "Promissory Notes," obtained millions of dollars from investors to allegedly purchase consumer debt portfolios. MERRILL then used the investor funds to pay other investors their principal and/or purported returns on their investments, and to fund MERRILL's purchases of real estate, jewelry, and high-end vehicles.

*Investor Agreements*

22.     Your affiant has obtained copies of records from a subpoena directed to New Direction IRA[1], based in Louisville, Colorado. The records include an "Investor Agreement," between Investor 1 and GCR. The document states, *"This Agreement is made and effective this 20th day of January, 2016 by and between Global Credit Recovery, L.L.C., a Maryland corporation ("Global") and New Direction IRA, Inc. FBO [Investor 1] Traditional IRA ("Investor")."* In addition, the "Investor Agreement" states in item one that *"Global shall partake in the business of buying, selling, and recovering consumer debt portfolios and shall identify and purchase such portfolios for Investor commensurate with the monetary investment made by Investor. Such portfolios shall be titled in the name of Investor and shall be managed at the sole discretion of Global and its management."*

---

[1] It is your affiant's understanding that New Direction, IRA Inc. is a company that specializes in self-directed IRAs. According to New Direction IRA, Inc.'s website, self-directed IRAs allow account holders to buy a full range of allowable assets, including real estate, precious metals, private equity stocks and more.

23.     Along with the Investor Agreement, New Direction IRA, Inc. required a "Private Equity Buy Direction Letter" form that was completed by Investor 1.  The Buy Direction Letter contained Investor 1's account information, investment information as well as other processing information. The "TELL US ABOUT YOUR INVESTMENT" section of the Buy Direction Letter lists "Global Credit Recovery" as the private stock name, MERRILL as the private stock manager, and lists the **Target Email** as the private stock manager's email address and the total purchase price of the investment as $190,500.00.  You affiant believes, based on the above statements, that MERRILL intended to use the **Target Email** as a means to perpetuate his fraud, and deceive Investor 1 about false debt portfolios that were never purchased.

24.     On February 1, 2016, Investor 1 sent a $190,500.00 interstate wire to DELMARVA's Wells Fargo account ending in 3493.Your affiant reviewed DELMARVA's Wells Fargo account ending in 3493 for the time period of Investor 1's transfer.  On February 2, 2016, MERRILL wire transferred $25,000 to a PNC bank account believed to be owned by MERRILL, transferred $50,000 to pay back two other persons believed to be investors, and then wired $15,000 to Stylish Occasions by Amanda.  Your affiant knows, based on reviews of the Facebook account of MERRILL's wife, that Stylish Occasions is a company owned and operated by MERRILL's wife, Amanda.  On February 3, 2016, MERRILL wire transferred an additional $20,000 from DELMARVA's account to a PNC bank account believed to be owned by MERRILL. At no point during your affiant's review of the DELMARVA account ending in 3493 was there a purchase of credit card debt totaling the amount Investor 1 wired to that account, and your affiant found no evidence of a special purpose vehicle created specifically for Investor 1.  MERRILL stated in his October 2017 interview with your affiant that MERRILL did not make money until the investor made the agreed upon net profits. Your affiant believes the use of new investor's funds to repay

old investors, the use of new investor funds for something different than the stated purpose of investing in debt portfolios, and the use of investor funds to make extravagant personal purchases are consistent with the operation of a Ponzi scheme.

25.      On January 12, 2016, two GCR "Investor Agreement(s)" were executed for Investor 2.  Item one of both agreements stated, *"Global shall partake in the business of buying, selling, and recovering consumer debt portfolios and shall identify and purchase such portfolios for Investor commensurate with the monetary investment made by Investor.  Such portfolios shall be titled in the name of Investor and shall be managed at the sole discretion of Global and its management."*  Item six of both agreements stated *"Global shall provide, via e-mail or other form of communication as may be agreed upon by the parties, quarterly activities report showing the progress of the portfolio and its recovery."*  Those agreements were signed by Investor 2 and MERRILL.   Along with the "Investor Agreement(s)" were "Private Equity Buy Direction Letter(s)" from New Direction IRA, Inc., which was a summary of the transaction.  The bottom of that document lists "Global Credit Recovery" as the private stock name, MERRILL as the private stock manager, and lists the **Target Email** as the private stock manager's email address.  Your affiant believes that based on the above statements, MERRILL intended to use the **Target Email** as a means to perpetuate his fraud and communicate with Investor 2 and other victims.

26.      On January 15, 2016, Investor 2 sent two interstate wire transfers to DELMARVA's Wells Fargo account ending in 3493 in the amounts of $369,593.90 and $283,368.62 totaling $652,962.52. On that same date, MERRILL wire transferred $106,400 to a Merrill Lynch account believed to be owned by another investor; transferred $50,000 to Investor Company A; paid $67,950 to Louis Vuitton for personal purchases; $30,000 to pay Investor/Investor 3; and then paid over $50,000 to collectively pay for MERRILL's personal credit

cards at Barclays, Chase, and American Express. At no point during your affiant's review of the DELMARVA Wells Fargo Account ending in 3493 was there a purchase of credit card debt totaling the amount Investor 2 sent to that account, and your affiant found no evidence of a special purpose vehicle created specifically for Investor 2, as MERRILL stated in his October 2017 interview. Your affiant believes the above actions are indicative of a Ponzi scheme.

*Promissory Note*

27.     On August 25, 2015, a "Promissory Note" was executed between Investor 3 and GCR. The terms of the note listed: amount borrowed by GCR of $149,891.98; an interest rate of 20%, frequency of payment as quarterly; periodic payment of $7,494.59; first payment due November 30, 2015; and a listed maturity date of August 31, 2016. The wiring instructions for Investor 3 listed "Kevin B. Merrill" as the contact. The wiring form included DELMARVA and GCR logos located below the instructions.

28.     MERRILL stated in his interview that funds obtained from investors were used to purchase consumer debt portfolios and estimated the majority of the debt he purchased was from major banks such as Chase Bank, Citibank, and Wells Fargo. MERRILL stated multiple times in the interview he did not "touch the money." However, a review of DELMARVA's Wells Fargo account ending in 3493 conducted by your affiant and forensic accountants of the FBI has revealed that MERRILL used investors' money to fund his extravagant life style to include approximately $1 million in casino expenses, $4 million in high end car purchases, $4 million in real estate related purchases, and $1.8 million in jewelry purchases. All of these personal expenses came from DELMARVA's Wells Fargo account ending in 3493. A further review of MERRILL's accounts showed that investors are paid back with funds from both GCR and DELMARVA accounts; however, there is no mention of DELMARVA in the Investor Agreement provided by MERRILL

in his interview on October 26, 2017, nor did MERRILL mention the existence of DELMARVA during that interview.

> MERRILL Used Electronic Mail, Including Emails To/From The Target MICROSOFT CORPORATION User Account, In Furtherance Of The Fraud

29.    Your affiant has obtained copies of records from a subpoena directed to New Direction IRA , based in Louisville, Colorado. These records include emails sent/received by MERRILL during the time period of the suspected illegal activity (in or about January 2012 to the present). These emails demonstrate MERRILL's use of the **Target Email** address to communicate with an investor and representatives of New Direction IRA and to obtain new investor funds in order to pay earlier investors, which is central to the investigation. Moreover, it appears from the email records that MERRILL used two different email accounts during the relevant time period: (1) kbm@payglobalcredit.com and (2) the **Target Email** account.

30.    On or about August 17, 2015, a New Direction, IRA representative emailed MERRILL at kbm@payglobalcredit.com and cc'd "[Investor 3]." The subject of the email was "FW: New Direction IRA – Unsecured Note Investing." The email attachments included documents with the file name "Borrower's_Acknowledgement_Letter.pdf." The email stated, *"Hello Kevin, I understand [Investor 3] will be making a debt investment with Global Credit through his IRA. To facilitate the transaction, in addition to our documents we need [Investor 3] to complete, we will need a Borrowers Acknowledgement Form completed and signed by a manager with your company."*

31.    On or about August 17, 2015, a representative of New Direction IRA contacted MERRILL at the **Target Email** regarding the possibility of Investor 3 investing with MERRILL and GCR. The New Direction IRA representative requested MERRILL send a "Borrower's Acknowledgment Form completed and signed by a manager with your company." On or about

August 25, 2015, MERRILL used the **Target Email** to send an email to an employee of New Direction with a copy of the Promissory Note/Buy Direction Letter for Investor 3. That letter contained the name, credit card number, and email of Investor 3 and listed the borrower's name as "Global Credit Recovery, LLC, 502 Washington Ave, Suite 410, Towson, MD 21204." The subject of the email was "attachment – [Investor 3]." In the email, MERRILL wrote "[name redacted] *– please let me know what else if anything is needed. We have several investors who utilize your company and we continually refer you as well. Thanks for your help – you guys are by far the best to deal with.*" On the same day, a Global Credit Recovery, LLC promissory note was executed between MERRILL and Investor 3. The "amount borrowed" by GCR from Investor 3 was $149,891.98.

32.    Your affiant reviewed the DELMARVA Wells Fargo account ending in 3493. On September 1, 2015, the account balance was $89,964.13. The interstate wire transfer from Investor 3 on September 2, 2015, in the amount of $149,891.08 brought the account balance to $239,856.11. Of that balance, $184,600 appeared to be paid back to investors, including $9,000 paid to Investor 3[2]. On September 8, 2015, $43,000 of the remaining balance of the Wells Fargo account ending in 3493 was spent on personal jewelry purchases by MERRILL, leaving a remaining account balance of $12,256.11. Your affiant believes the use of new investor's funds to repay old investors, the use of new investor funds for something different than the stated purpose of investing in credit

---

[2] The check payment to Investor 3 occurred on September 2, 2015 and cleared Wells Fargo account ending in 3493 on September 4, 2015. At this time, it is unknown why the $9,000 payment was made to Investor 3. However in the New Direction IRA, Inc. "Borrower's Acknowledgement Letter," which was signed by MERRILL, "All payments, income distributions and/or payoffs for this holding must be sent to New Direction IRA, Inc. Under the Internal Revenue Code, it is never acceptable to send funds directly to an IRA holder or IRA holder's nominee. Should that happen, you agree to indemnify New Direction IRA, Inc. against all liability concerning the IRS compliance."

card debt, and the use of investor funds to make extravagant personal purchases are consistent with the operation of a Ponzi scheme.

33.     In this particular investigation, your affiant submits that there is probable cause to believe the **Target Email** account still contains relevant emails because when investigators interviewed MERRILL on October 26, 2017, MERRILL provided investigators a copy of a standard GCR investor agreement. The agreement listed a business address of 502 Washington Ave., Suite 410, Towson, MD, 21204 and a business website address of www.gcrinvest.com. The agreement also listed contact telephone numbers (410) 929-7747, (888) 929-7747 and fax number (443) 841-7122. In the body of the investor agreement, item number six states, "*Global shall provide, via email or other form of communication as may be agreed upon by the parties, a quarterly activities report showing the progress of the portfolio and its recovery.*" Based on this document, your affiant submits MERRILL continues to use email to further his scheme.

34.     MERRILL's scheme began as far back as 2012 and is currently ongoing. Based on your affiant's training, knowledge, experience on the use of email, it is not uncommon for persons to store and keep emails for many years after the fraud had been committed. Current financial records obtained through subpoena indicate MERRILL continues to deposit investors' funds and pay investors through GCR and DELMARVA bank accounts. Your affiant believes based on an analysis of GCR's, DELMARVA's and associated bank accounts that MERRILL does not have the means to make his victims whole and is more apt to continue his current scheme in order to repay his victims with other investors' monies. There is a strong likelihood that there are additional emails at the **Target Email** sent and received in furtherance of the fraudulent scheme. Lastly, MICROSOFT Inc. records have indicated MERRILL's **Target Email** remains active as of January 2018.

14

## MICROSOFT CORPORATION.

35.     On or about February 2, 2018, MICROSOFT provided your affiant with records showing that the subscriber for the **Target Email** was "Kevin Merrill" and the user account associated with that email address was created in September 2014.  The user account has many different services associated with it per the MICROSOFT records, including email, Windows Live, and Location History, among other services.   Your affiant believes from his training and experience that these other services associated with the user account may contain very helpful records.

36.     Based upon my knowledge and training, as well as my consultations with other law enforcement agents who have extensive training in collecting and analyzing electronic evidence, I know that emails that are sent to MICROSOFT subscribers are stored in the subscriber's "mail box" on MICROSOFT servers until the subscriber deletes the email.  If the subscriber does not delete the message, the message can remain on MICROSOFT servers indefinitely.  Moreover, even if the subscriber deletes the email, it may continue to be available on MICROSOFT servers for a certain period of time.

## BACKGROUND CONCERNING EMAIL

37.     In my training and experience, I have learned that MICROSOFT provides a variety of on-line services, including electronic mail ("email") access, to the public. MICROSOFT allows subscribers to obtain email accounts at various domain names to include "gcrinvest.com," like the email account listed in Attachment A. Subscribers obtain an account by registering with MICROSOFT. During the registration process, MICROSOFT asks subscribers to provide basic personal information. Therefore, the computers of MICROSOFT are likely to contain stored electronic communications (including retrieved and non-retrieved email for MICROSOFT

subscribers) and information concerning subscribers and their use of MICROSOFT services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

38.     A MICROSOFT subscriber can also store with the provider files in addition to emails, such as address books, contact lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by MICROSOFT.  In my training and experience, evidence of who was using an email account, as well as evidence of a crime, may be found in address books, contact lists, emails in the account, and attachments to emails, including pictures and files.

39.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

40.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the

account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

41.    In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

## CONCLUSION

42.    Based on the foregoing, I request that the Court issue the search warrant for the **Target Email**. Because the warrant will be served on MICROSOFT, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

18 - 7 0 5  - ADC

## REQUEST FOR SEALING

43.      I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Your affiant is not aware that MERRILL knows that after the October 26, 2017, interview, the FBI intensified its investigative efforts.  Your affiant is concerned that if MERRILL learned about the ongoing investigation, about the application for a search warrant, or especially the facts in this affidavit, he could attempt to delete files from his user account at MICROSOFT, and/or destroy other relevant evidence, including records that are likely present at MERRILL's office in Towson, Maryland.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation.

LOI H. CAO
SPECIAL AGENT, FBI


Subscribed and sworn to before me on March _12_, 2018.

HONORABLE A. David Copperthite
UNITED STATES MAGISTRATE JUDGE

18

**18 - 7 0 5  - ADC**

### ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with **KEVIN@GCRINVEST.COM** that is stored at premises controlled by MICROSOFT, a company that accepts service of legal process at 1 Microsoft Way, Redmond, Washington, WA 98052.

1

**18 - 7 0 5   - ADC**

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by MICROSOFT (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, <u>including any emails, records, files, logs, or information that has been deleted but is still available to the Provider,</u> the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

d.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

18 - 7 0 5   - ADC

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence

and instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), those violations involving

**KEVIN MERRILL** and occurring between **January 2012** through **present**, including, for each

account or identifier listed on Attachment A, information pertaining to the following matters:

    **a.**    Information relating to who created, used, or communicated with the account,

including records about their identities and whereabouts.

    **b.**    Any logs maintained regarding date and time of log-ins;

    **c.**    Any IP addresses associated with the log-ins;

    **d.**    Any communication with investors or potential investors, their brokers,

representatives, financial advisors or the like;

    **e.**    Any communication with actual or potential co-conspirators;

    **f.**    Communications with entities and persons from MERRILL, GCR, DeVille Asset

Management, and any other person/entity concerning the actual or potential purchase of credit

card/debt portfolios;

    **g.**    Communications with entities and persons from MERRILL, GCR, DeVille Asset

Management, and any other person/entity concerning the actual or potential sale of credit debt

portfolios;

    **h.**    Any records concerning return on investment(s) including, but not limited to,

quarterly statements, year-end statements, email communication with investors concerning

investment return;

    **i.**    Any communication with collection agencies;

    **j.**    Any records concerning remittance by collection agencies;

18 - 7 0 5  - ADC

    **k.**    Any communication relating to the personal purchases of real estate by MERRILL to include wire instructions;

    **l.**    Any communication concerning the purchase of luxury goods to include cars, jewelry, or any other personal luxury goods;

    **m.**    Any communication concerning personal finances of MERRILL to include bank statements, credit card statements, or any other records relating to MERRILL's depository or investment accounts;

    **n.**    Any communication with any financial institution relating to the receipt, transfer, or expenditure of funds;

    **o.**    Any communication regarding business expenses, rent payments, leases, computer services or any other overhead expense of GCR, DELMARVA, or any SPV.

18 - 7 0 5   - ADC

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct.  I am employed by MICROSOFT, and my

official title is _____.  I am a custodian of records for

MICROSOFT.  I state that each of the records attached hereto is the original record or a true

duplicate of the original record in the custody of MICROSOFT, and that I am the custodian of

the attached records consisting of _____ (pages/CDs/kilobytes).  I further state that:

     a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

     b.     such records were kept in the ordinary course of a regularly conducted business

activity of MICROSOFT; and

     c.     such records were made by MICROSOFT as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.

_____     _____

Date                   Signature